**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| CHRISTOPHER L. SUMPTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:10CV00035 AGF |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This action is before this Court for judicial review of the final decision of the

Commissioner of Social Security finding that Plaintiff Christopher Sumpter was not

disabled and, thus, not entitled to disability insurance benefits under Title II of the Social

Security Act, 42 U.S.C. §§ 401-434, or Supplemental Security Income under Title XVI of

the Act, *id.* §§ 1381-1383f.  For the reasons set forth below, the decision of the

Commissioner shall be reversed and remanded.

Plaintiff, who was born on May 15, 1975, filed his applications for benefits on

August 15, 2006, at the age of 31, alleging a disability onset date of October 7, 2005, due

to neck, back and elbow pain, depression, and anxiety.  After Plaintiff's applications were

denied at the initial administrative level, Plaintiff requested a hearing before an

Administrative Law Judge ("ALJ") and such a hearing was held on June 24, 2008.  By

decision dated July 21, 2008, the ALJ found that Plaintiff was disabled for a closed

period of time from October 7, 2005, through June 3, 2008, but that beginning June 4,

2008, Plaintiff had the residual functional capacity ("RFC") to perform certain jobs that were available in the national economy, and was thus not disabled under the Act after that date.  Plaintiff's request for review by the Appeals Council of the Social Security Administration was denied on April 6, 2010.  Plaintiff has thus exhausted all administrative remedies and the ALJ's decision stands as the final agency action now under review.

Plaintiff argues that the ALJ's decision that he was not disabled after June 4, 2008 is not supported by substantial evidence in the record.  Specifically, Plaintiff argues that the ALJ's finding that Plaintiff's mental impairments improved as of June 4, 2008, to the point where there were jobs that he was capable of performing, is not supported by medical evidence.  In addition, Plaintiff asserts that the ALJ improperly evaluated Plaintiff's credibility.  Plaintiff asks that the ALJ's decision be amended to a fully favorable decision or remanded for further evaluation of Plaintiff's RFC beginning June 4, 2008.

## BACKGROUND

### Work History and Application Forms

The record indicates that Plaintiff worked full time as a press break operator and welder from March 2004 to December 16, 2005, earning $10.00 per hour.  Prior to that job, Plaintiff worked as a janitor from January 2004 through March 2004, a line worker from March 2001 through February 2002, and a mechanic for about six months in 1999-2000.  (Tr. 121.)

2

In the Function Report section of his application for benefits, Plaintiff stated that he lived with his girlfriend and his two young children.  Plaintiff described his daily activities as, "I get up.  Go to the living room, turn T.V. on.  Watch T.V. for awhile.  Then I fix me and my son something to eat, usually a bowl of cereal.  Then I put my shorts on and flip flops on.  Put my son's clothes on and go out side.  I sit and watch him play.  Then we come in and lay down and watch T.V. or take a nap."  Plaintiff indicated that he "watched [his] kids," was able to mow the grass and do the dishes, but had trouble putting on his shoes or socks.  (Tr. 139-41.)

In the Disability Report section of his application, Plaintiff wrote that he was 6' tall and weighed 260 pounds, and that he took Lisinopril to control blood pressure and Prilosec for acid reflux.  (Tr. 119, 125.)  In the Disability Appeal form requesting a hearing before an ALJ, the medications listed by Plaintiff as ones he was currently taking were Naproxen for back pain, Lisinopril for blood pressure, Zegerid for his stomach, Omacor for cholesterol, and Zoloft, Geodon, and Trazodone for depression/anxiety and sleep problems.  (Tr. 168.)

**Medical Record**

From January 2005, the record documents back pain and degenerative disc disease, resulting in lumbar spinal fusion surgery on October 7, 2005.  Meanwhile, on September 15, 2005, Plaintiff saw his primary care provider, Julie Burdin, M.D., with complaints of trouble sleeping and trouble with anger management.  Dr. Burdin prescribed Zoloft.  (Tr. 290.)

3

On October 7, 2005, Plaintiff underwent a spinal fusion.  On February 7, 2006, Plaintiff visited W.B. Rodgers, M.D., to follow up on his lumbar fusion surgery.  Dr. Rodgers stated that the x-rays looked good and that Plaintiff was doing well and only having trouble when he leaned over.  On May 16, 2006, Dr. Rodgers stated that Plaintiff was "doing pretty good," and released Plaintiff to "resume his activities."  (Tr. 173-74.)

On February 27, 2007, Plaintiff complained to Dr. Burdin of depression and irritability, and stated that frequently his anger was out of proportion to stimulus.  Dr. Burdin assessed neck and limb pain, numbness of the hands, and depressive disorder, and prescribed Celexa.  (Tr. 267-68.)  An MRI dated March 1, 2007 revealed mild posterior disc bulges at C5-6 and C6-7 without significant canal stenosis or neuroforaminal narrowing.  (Tr. 249.)  When Plaintiff returned to Dr. Burdin on March 12, 2007, she diagnosed depression with prominent irritability.  (Tr. 269-70.)

Upon referral by Dr. Burdin, Plaintiff visited Kevin Marberry, M.D., an orthopedist, on March 19, 2007, with complaints of right elbow pain.  Dr. Marberry diagnosed Plaintiff with severe degenerative joint disease of the right elbow and bilateral carpal tunnel syndrome.  (Tr. 205-07.)  Plaintiff underwent a right elbow arthroscopy and right carpal tunnel release on April 12, 2007.  (Tr. 241-44.)

At a follow-up appointment with Dr. Burdin on April 16, 2007, Plaintiff complained of irritability and insomnia and stated that he was getting two hours of sleep a night and had issues with concentration.  Dr. Burdin started Plaintiff on Restoril for the insomnia.  (Tr. 295-96.)  On April 23, 2007, at a follow-up appointment with Dr.

Marberry, Plaintiff stated that he no longer had numbness or tingling in his right hand and that he was "very pleased with the surgery." (Tr. 211-12.)

On May 14, 2007, Plaintiff saw Dr. Marberry for another follow-up and reported that he had no complaints with regard to either of the surgeries, and wanted to have a left carpal tunnel release. (Tr. 213-14.) On May 21, 2007, Plaintiff returned to Dr. Burdin with complaints of sleep disturbances despite taking a sleep aid before "he dozed off." Dr. Burdin increased the Restoril dosage. (Tr. 297-98.) On June 14, 2007, Plaintiff underwent a left carpal tunnel release surgery. (Tr. 227-29.)

On June 19, 2007, Plaintiff met with Jeffrey Harden, D.O., for a psychiatric evaluation for consideration of Medicaid services. Plaintiff reported that he had been sexually abused by his uncle on occasion and that his grandfather and cousin had committed suicide. Dr. Harden wrote that Plaintiff had poor concentration, obsessive thoughts regarding aggressive behaviors, intermittent suicidal ideation, occasional traumatic flashbacks, and monthly panic attacks. He diagnosed Plaintiff with Posttraumatic Stress Disorder ("PTSD"), Attention Deficit Hyperactive Disorder ("ADHD"), and Major Depressive Disorder. Dr. Harden wrote that these multiple psychiatric diagnoses caused Plaintiff to be emotionally liable and were the principle psychiatric difficulty preventing him from maintaining employment. He assigned

5

Plaintiff a current and year-high Global Assessment of Functioning ("GAF") score of 50.[1]

(Tr. 182-84.)

Plaintiff followed-up with Dr. Marberry on June 25, 2007, and reported that the

neurological symptoms of the left hand were completely resolved.  (Tr. 218-19.)  At

another follow-up appointment with Dr. Marberry on July 23, 2007, Plaintiff stated that

he had occasional pain, but no numbness, tingling, or neurological complaints regarding

his left hand.  Dr. Marberry noted that Plaintiff was able to perform fine motor activities

without pain or difficulty.  (Tr. 220-22.)  On July 24, 2007, Plaintiff returned to Dr.

Burdin with complaints of insomnia.  Dr. Burdin diagnosed PTSD, started Plaintiff on

Lunesta, and referred him to a counselor.  (Tr. 300-01.)

On August 9, 2007, Plaintiff visited Raj Kakarlapudi, M.D., with complaints of

neck pain.  Diagnostic imaging showed "equivocal spurring at C6 and C7 end-plate

levels," and "minimal lower cervical spondylosis."  Plaintiff was advised to start a

cardiovascular exercise routine and to avoid activities that made his neck pain worse.

(Tr. 233-37.)

On October 30, 2007, Plaintiff told Dr. Burdin that he felt angry at least three-

---

[1]    A GAF score represents a clinician's judgment of an individual's overall
ability to function in social, school, or occupational settings, not including impairments
due to physical or environmental limitations.  Diagnostic & Statistical Manual of Mental
Disorders (4th ed.) (DSM-IV) at 32.  GAF scores of 31-40 indicate "major" impairment
in social, occupational, or school functioning; scores of 41-50 reflect "serious"
impairment in these functional areas; scores of 51-60 indicate "moderate" impairment;
scores of 61-70 indicate "mild" impairment.

fourths of the time, and that it had caused marital discord.  Dr. Burdin noted feelings of worthlessness, feelings of hopelessness, anhedonia, depression, and increased stress. Plaintiff complained that his concentration was poor and that he experienced occasional suicidal thoughts.  Noting that Cymbalta, Paxil, and Lexapro had all been tried, Dr. Burdin prescribed Zoloft and Depakote.  (Tr. 306-07.)  At a follow-up visit with Dr. Burdin on December 11, 2007, Plaintiff continued to have irritability on Zoloft so Dr. Burdin started him on Trazodone.  (Tr. 309-10.)

On January 22, 2008, Plaintiff returned to Dr. Burdin and complained that he was still depressed and irritable, but was sleeping well with Trazodone.  Dr. Burdin commented that Plaintiff was unemployed, seeking disability benefits, and pursuing vocational rehabilitation.  She increased Plaintiff's Trazodone dosage, noting that Plaintiff felt he needed the increased dosage during the day to help him "turn off his mind."  (Tr. 311-12.)  On March 4, 2008, Plaintiff told Dr. Burdin that he was still irritable, but sleeping well and was almost too sleepy at times.  (Tr. 313-14.)  On April 22, 2008, Plaintiff stated that he was still feeling depressed, but was better than before. Dr. Burdin noted that Plaintiff's sleep pattern was much better.  (Tr. 315-16.)

On June 3, 2008, Plaintiff told Dr. Burdin that he was still irritable and that he became angry with minimal stimulus.  Plaintiff experienced passive death-wish feelings and restless sleep with vivid dreams.  Noting that Cymbalta and Depakote had not improved Plaintiff's syndromes, Dr. Burdin prescribed Geodon and assessed Plaintiff with depressive disorder.  Dr. Burdin also noted that Plaintiff had been helping his friend

remodel a house and had taken his children on bicycle rides.  (Tr. 311-18.)

Plaintiff began counseling sessions with Lori Lassinger, M. Ed, LPC, on June 4, 2008.  He reported that his mood was most often irritable and that he had trouble getting along with family, and that he often thought about difficult events in his childhood, such as his grandfather committing suicide in front of him at an early age and getting molested by his uncle.  She opined that Plaintiff's anger and irritability "might be his depression" and that he might still be traumatized by events in his past.  At a follow-up on June 11, 2008, Plaintiff reported difficulty getting along with his in-laws and stress during clashes with his children.  A follow-up was scheduled for one week later.  (Tr. 332-33.)

On June 25, 2008, Dr. Burdin wrote a letter to "To Whom It May Concern," stating that she had treated Plaintiff for several years and that Plaintiff had a diagnosis of depressive disorder with predominant symptoms of anger and irritability out of proportion to stimulus.  She wrote that she had tried a number of medications, and that Plaintiff continued to be under her treatment for this condition.  (Tr. 335.)

**Evidentiary Hearing of June 25, 2008** (Tr. 6-34)

Plaintiff, who was represented by counsel, testified that he was 33 years old, 6' tall and weighed 246 pounds, and had completed 12 years of education.  Plaintiff then summarized his work history.  He testified that he was fired from his job as a line worker (in February 2002) because he did not call in to work for three days, and he was also fired from his job as a press break operator (on December 16, 2005) because he threatened someone.  He testified that while working as a line worker (2001-2002),

"something in [his] lower back popped" and the company doctor diagnosed a small tear in the L5, S1 and two bulging discs in his back.

Plaintiff testified that after the lumbar fusion surgery (in October 2005), he no longer had numbing in his legs, but that the back pain was about the same as prior to the surgery.  He still took pain medicine, but it did not help.  Plaintiff stated that he also had surgery to repair a torn rotator cuff in 1998, and still experienced pain through his shoulder.

Plaintiff testified that, in addition to his physical conditions, he suffered from ADHD and "mental status" problems.  He was currently being treated by Dr. Burdin and Ms. Lassinger and was scheduled for re-evaluation by Dr. Harden.  Plaintiff testified that he had been referred to vocational rehabilitation, but he postponed this to try to get his own business started.  Plaintiff testified that he had trouble controlling his anger and staying focused.

Plaintiff stated that he lived with two of his children, ages four and seven, and his girlfriend at his girlfriend's parents' house.  He used to mow the grass and do other chores around the house, but stopped because he got mad about feeling unappreciated. He sometimes went grocery shopping with his girlfriend, but often rushed her because he could only focus in the store for 15 to 20 minutes and then had to find a place to sit down or he would get anxious.  Plaintiff testified that he could be on his feet for about half an hour before he had to sit or lay down.  Once he was sitting, he could only sit for half an hour to an hour before he started to feel uncomfortable.

9

Plaintiff stated that he no longer had a driver's license, but knew how to drive.  He occasionally visited his father, brother, or grandmother, and was not involved in his childrens' activities.  Plaintiff testified that generally, he spent his days watching television or playing Play Station with his son.  He was currently taking Zoloft, Zegerid, Geodon, Naproxen, Trazadone, and Amicor.

Plaintiff testified that he experienced headaches and neck pain if he held his head down for a long period of time.  He was most comfortable when he was lying down, and he usually did this once or twice a day for half an hour to an hour.

Plaintiff testified that he "went off" on his children a lot and was diagnosed with bipolar disorder.  He stated that his depression led him to think about suicide a lot and that when he was a child, he watched his aunt commit suicide and was physically and mentally abused by his father.  Plaintiff stated that he had lost four or five jobs in the past because of fighting or not getting along with other people.  He left the rest of his jobs because he was bored or did not like the job.  No further treatment for his back had been suggested and he still took pain medicine.

The ALJ then asked the VE to consider an individual of Plaintiff's age, education, and work experience, who could not lift anything over 20 pounds, but could lift 20 pounds on occasion and 10 pounds frequently; had to get off his feet or lay down after half an hour of standing or sitting because of back discomfort; and if able to do this alternatively, would be able to work a normal eight-hour work day with proper attention and concentration.

The VE testified that such an individual could perform unskilled light jobs[2] such as assembly jobs of small items, packaging inspector, cashier in a situation that allowed them to alternate their sitting and standing, and unarmed security type work.  The VE testified that such jobs existed in significant numbers in the local and national economies.

The VE then stated that if the hypothetical person had depression problems and anger control problems that were aggravated by being around people, that would eliminate the cashier jobs, but not the security guard job because that job did not involve interaction with other employees or the public.  If the person also had problems focusing, whether from an attention deficit problem or from depression, this would eliminate all the jobs the VE had identified.  The VE further testified that none of the jobs he had identified would allow an individual to lie down during the day, and would allow only two brief breaks of about 15 minutes and a 30 minute lunch period.

**ALJ's Decision of October 28, 2008** (Tr. 42-51)

The ALJ found that Plaintiff had not engaged in substantial gainful activity since October 7, 2005, and had the severe impairments of ADHD, major depressive disorder,

---

[2]   Light work is defined in the regulations as "work that involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities."  20 C.F.R. § 404.1567.

bulging discs with retrolithesis and spondylosis at C5-6 and C6-7, carpal tunnel

syndrome, and previous arthroscopic surgery in his right elbow, but that none of these

impairments, individually or in combination, equaled a deemed-disabling impairment

listed in the Commissioner's regulations.

The ALJ summarized the medical record and concluded that the records beginning

on June 4, 2008, did not indicate significant limitations resulting from Plaintiff's

exertional or non-exertional impairments.  The ALJ stated that since that date, the records

did not document any clinical testing, such as MRIs, x-rays, or bone scans documenting

any degenerative disc disease, degenerative joint disease, or arthritis significant enough to

result in functional limitations.  Plaintiff did not receive aggressive treatment or take

medications for his exertional limitations, and nothing in the medical records indicated

that Plaintiff's combination of impairments was severe enough to preclude him from

performing all work available in the national economy.  Furthermore, the ALJ noted that

after June 3, 2008, the medical record did not document that any treating physician had

ever found or imposed any long-term, significant physical limitations upon Plaintiff's

functional capacity.  The ALJ found that Plaintiff had "a fair range" of daily activities,

which underscored that his physical impairments had improved.  The ALJ referenced

Plaintiff's statement to Dr. Burdin on June 3, 2008, that he helped a friend remodel a

house and took his children on bicycle rides.

The ALJ stated that records beginning in early 2008 indicated that Plaintiff's

mental impairments had improved as well.  Plaintiff did not require any hospitalizations

for mental health reasons and, according to the ALJ, counseling notes dated June 4, 2008, indicated that Plaintiff was not depressed.  The ALJ also stated that Plaintiff "was pursuing vocational rehabilitation."

The ALJ concluded that during the period from October 7, 2005, until June 4, 2008, Plaintiff had the physical RFC to perform light work, with certain limitations, but that his mental impairments interfered with his concentration, persistence, and pace, and he would, thus, be unable to sustain work-related activities in a work setting on a regular and continuing basis.  The ALJ found further, however, that beginning on June 4, 2008, Plaintiff had the RFC to lift up to 20 pounds, frequently lift up to ten pounds, stand or walk six hours in an eight-hour work day and sit six hours in an eight-hour work day, but had to avoid close interaction with co-workers or the general public.

The ALJ concluded that Plaintiff could not perform his past work, but, based on the testimony of the VE, could perform the work of an assembler of small parts, inspector or hand packager, cashier, or security guard, and was thus not disabled under the Social Security Act.

## **DISCUSSION**

### **Standard of Review and Statutory Framework**

In reviewing the denial of Social Security disability benefits, a court "must review the entire administrative record to 'determine whether the ALJ's findings are supported by substantial evidence on the record as a whole.'"  *Johnson v. Astrue*,  628 F.3d 991, 992 (8th Cir. 2011).  The court "'may not reverse . . . merely because substantial

evidence would support a contrary outcome.'  Substantial evidence is that which a

reasonable mind might accept as adequate to support a conclusion." *Id.* (citations

omitted); *see also Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (explaining that

the concept of substantial evidence allows for the possibility of drawing two inconsistent

conclusions, and therefore, embodies a "zone of choice," within which the Commissioner

may decide to grant or deny benefits without being subject to reversal by the reviewing

court).

To be entitled to benefits, a claimant must demonstrate an inability to engage in

substantial gainful activity which exists in the national economy, by reason of a medically

determinable impairment which has lasted or can be expected to last for not less than 12

months.  42 U.S.C. § 423(d)(1)(A).  The Commissioner has promulgated regulations,

found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to

determine disability.  The Commissioner begins by deciding whether the claimant is

engaged in substantial gainful activity.  If so, benefits are denied.  If not, the

Commissioner decides whether the claimant has a severe impairment or combination of

impairments. "An impairment is not severe if it amounts only to a slight abnormality that

would not significantly limit the claimant's physical or mental ability to do basic work

activities." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).  A special technique is

used to determine the severity of mental disorders.  This technique calls for rating the

claimant's degree of limitations in four areas of functioning: activities of daily living;

social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3).

If the impairment or combination of impairments is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the deemed-disabling impairments listed in Commissioner's Regulations.  If not, the Commissioner asks at step four whether the claimant has the RFC to perform his past relevant work.  If so, the claimant is not disabled.  If he cannot perform his past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform work that is available in the national economy and that is consistent with the claimant's vocational factors -- age, education, and work experience.  *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010).

**ALJ's Finding of Plaintiff's RFC as of June 4, 2008**

Plaintiff argues that there is no rational basis or adequate explanation for the ALJ's conclusion that Plaintiff's mental impairments stopped interfering with Plaintiff's capacity for concentration, persistence, and pace as of June 4, 2008.  The court agrees. The ALJ's statement that counseling notes dated June 4, 2008, indicated that Plaintiff was not depressed is inaccurate.  As noted above, Ms. Lassinger's notes indicated that Plaintiff's anger might be related to his depression, and she scheduled future weekly appointments with him.  Furthermore, Dr. Burdin's notes from June 3, 2008, indicated

that Plaintiff was experiencing death wishes, and that his prior medications for depression were not working.  She prescribed Geodon and diagnosed depressive disorder.  Thus, the medical records during this time period do not indicate that Plaintiff's mental impairments had improved to the extent that he would be able to engage in substantial gainful activity.

The ALJ "bears the primary responsibility for assessing a claimant's [RFC] based on all the relevant evidence."  *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000).  A claimant's RFC is a medical question, and, if needed, the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.  *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000).

It may well be that at some point after June 4, 2008, Plaintiff's mental status did improve, but such a finding would require further development of the record.[3]  *See, e.g., Sultan v. Barnhart*, 368 F.3d 857, 863 (8th Cir. 2004) (explaining that an ALJ is required to recontact medical sources if the available evidence does not provide an adequate basis for determining the merits of the disability claim).

Ordinarily, when a reviewing court concludes that a denial of disability benefits was improper, the court, out of "abundant deference to the ALJ," should remand the case

---

[3]    Plaintiff presents his argument based on the seven-step evaluation process for terminating disability benefits of a claimant who is already receiving them, as set forth in 20 C.F.R. § 416.994(b)(5).  This, however, is not a termination-of-benefits case, and the regular evaluation process applies.  *See, e.g., Johnston v. Shalala*, 42 F.3d 448, 450 (8th Cir. 1994).

for further administrative proceedings; remand with instruction to award benefits is appropriate "only if the record 'overwhelmingly supports' such a finding." *Buckner v. Apfel*, 213 F.3d 1006, 1011 (8th Cir. 2000) (citations omitted).  The Court does not believe that here there is  overwhelming evidence that would warrant an order that benefits be awarded.  Rather the Court believes the ALJ should be granted a chance to more fully consider Plaintiff's RFC, and possibly further develop the record and/or obtain the testimony of a vocational expert with regard to Plaintiff's ability to work.

## CONCLUSION

The Court concludes that the ALJ's determination of Plaintiff's physical RFC as of June 4, 2008, is supported by the record.  However, the decision that Plaintiff's mental impairments no longer interfered with his ability to work as of June 4, 2008, is not supported by substantial evidence.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED and REMANDED.**

A separate Judgment shall accompany this Memorandum and Order.


_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 23rd day of September, 2011.

17